UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| GREGORY K. PEACOCK, §<br>    *Plaintiff,* §<br> §<br>v. §<br> §<br>CARPEDIA INTERNATIONAL, LTD., *et al.* §<br>    *Defendants.* § | CIVIL ACTION H-10-2273 |

### ORDER

Before the court in this diversity case involving an employment contract between plaintiff Gregory Peacock (plaintiff or "Peacock") and defendant Carpedia International, Inc. (defendant or "Carpedia"), are the parties' cross-motions for summary judgment on all pending claims and counterclaims. Dkts. 132, 134. Also before the court are three motions filed by Carpedia to strike various portions of plaintiff's summary judgment exhibits. Dkts. 156, 175, 184. After a review of the motions, the responses, and the applicable law, Carpedia's motion for summary judgment is GRANTED with respect to all of plaintiff's claims, and plaintiff's motion is DENIED with respect to plaintiff's claims. Plaintiff's motion for summary judgment with respect to Carpedia's counterclaims for fraud, negligence, breach of contract, declaratory relief, and specific performance, is GRANTED, and Carpedia's motion for summary judgment with respect to its counterclaims for specific performance and declaratory judgment are DENIED. Carpedia's motions to strike (Dkts. 156, 175, and 184) are DENIED AS MOOT because the court has disregarded any legal conclusions or otherwise improper affidavit evidence offered by plaintiff.

### BACKGROUND

Carpedia is a consulting firm that helps companies improve their cash flow without the need for additional capital by working at the client's work site to improve the client's product, process,

management systems, and behaviors. Dkt. 135-1 at 2. Carpedia's sales process involves business development associates identifying potential clients and setting up "initial meetings" where Carpedia sales executives (like plaintiff) attempt to convince potential clients to allow Carpedia to perform an analysis of the client's business, highlighting areas where improvement could be made. *Id*. The analysis is done "for incurred expenses only," and no commission is paid to the sales executive unless the client then agrees to hire Carpedia to perform some or all of the additional services that are identified in the analysis. *Id*. at 3. When a client agrees to purchase Carpedia's services, sales commissions are paid to the sales executives on the basis of payments Carpedia actually receives from clients. *Id*.

Peacock was hired by Carpedia as a sales executive after the parties engaged in discussions during September and October 2006. Dkt. 48. The parties hotly dispute the nature of representations allegedly made both by Carpedia's senior executives and Peacock during these initial discussions, and both parties allege that they were fraudulently induced into the employment contract by the other party's misrepresentations. The relevant disputes concerning the parties' alleged pre-contract representations will be addressed during the analysis portion of this order. Ultimately, Peacock signed an employment agreement and was employed as a sales executive by Carpedia from January 2007 until he voluntarily resigned to take new employment in April 2010. Dkt. 132 ¶ 20.

The contractual dispute in this case came to a head in the weeks prior to Peacock's departure, when the parties engaged in discussions concerning Peacock's entitlement to additional commission payments after his departure from Carpedia. On March 24, 2010, when Peacock indicated his desire to leave Carpedia, he suggested that he could stay on through "the end of this summer when [his] commissions would be fully paid," or alternatively that he could leave earlier which would require

"a separate agreement" for "outstanding commissions."[1] Dkt. 135-3 at 54. Mark Follows responded for Carpedia on March 25, 2010, and took the position that Peacock's "terms of employment do not allow for the payment of commissions when an employee chooses to leave" Carpedia and that "there needs to be an agreement that adds sufficient value to change that position." *Id*. at 55. On April 15, 2010, in response to Peacock's inquiry about commissions, Mark Follows told Peacock that he had "no way of predicting" the decision by the partners on a final number, but that "I have asked Lana to pay you through the end of the month" and that this was Mark Follows' "minimum offering" to Peacock. *Id*. at 2. On April 23, 2010, Mark Follows made an offer on behalf of Carpedia which included the salary payment for April 2010, and an additional payment which would be made if Peacock signed a release before May 14, 2010. *Id*. at 17. If the release was signed by May 14, 2010, the "final payment" would be processed. *Id*. Mark Follows also stated that "[t]he enclosed release comes with a 21 day period of consideration at which time it will become null and void." *Id*. Peacock's salary payment for April was made to his bank account on April 30, 2010, but Peacock did not sign the release before May 14, and he did he receive the "additional payment" Carpedia offered. Dkt. 135-2 at 4.

Peacock thereafter filed this lawsuit and alleges claims for breach of contract, fraudulent inducement, and tortious interference with contract. Dkt. 48. More specifically, Carpedia is alleged to have breached its contract with Peacock by failing to pay commissions after Peacock resigned, and by failing to provide the sales leads necessary for Peacock to earn higher commissions during his time with Carpedia. Dkt. 48. Peacock also alleges that he was fraudulently induced by Carpedia,

---

[1] The parties agree that commissions were paid as the money came in from clients. Thus, Peacock was able to look ahead and determine what client payments were due to come in following his departure, which would then be the basis for commission payments.

3

and by Mark Follows and Peter Follows individually, to enter into the employment contract through promises of sales leads and business performance that were unrealistic and not delivered. *Id*. Finally, Peacock alleges that Mark Follows and Peter Follows, acting both for Carpedia and/or in their own interests, interfered with Peacock's employment contract with Carpedia both in failing to provide the promised sales leads, and in convincing Carpedia not to pay commissions that were due to Peacock when he resigned. *Id*.

Carpedia's amended counterclaims seek relief for breach of contract, money had and received, and declaratory judgment. Dkt. 77. More specifically, Carpedia alleges that Peacock's acceptance of a partial payment towards a severance package constituted his agreement to the deal proposed by Carpedia, and that Peacock should be bound to the terms of the severance and the release. *Id*. In the alternative, Carpedia alleges that Peacock failed to accept the release, and should return the money already paid on the basis that the April salary payment was part of an offer that Peacock never accepted. *Id*.

The parties have filed cross-motions for summary judgment with respect to Peacock's claims and Carpedia's counterclaims. The motions have been fully briefed, and they are ripe for disposition.

## LEGAL STANDARD

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## ANALYSIS

**1.    Breach of Contract.**

To succeed on a breach of contract claim, a plaintiff must establish the following elements: (1) a valid enforceable contract existed; (2) the plaintiff performed or tendered performance; (3) the

defendant breached the contract; and (4) the defendant's breach was the cause of plaintiff's injury. *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 713 (Tex.App.-Corpus Christi 2006, pet. denied). "When a party materially breaches a contract, the other party may treat the contract as ended and cease performance. Thus, a party who fails to perform his obligation may not thereafter enforce the remaining terms of the contract against the other party." *Interceramic, Inc. v. South Orient R.R. Co., Ltd.*, 999 S.W.2d 920, 924 (Tex.App.-Texarkana 1999, pet. denied).

The primary goal of the court in a contract case is to ascertain the parties' intention in entering into the contract. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Where the terms of a contract are unambiguous as they appear in the contract, there is no need for further interpretation, and the question of whether an ambiguity exists is a question of law for the court to decide. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 424 (Tex. 2000). Where a court can give a definite legal interpretation of a contract from its words, then the contract is not ambiguous and will be construed as a matter of law. *Coker*, 650 S.W.2d at 393.

### a. Was Peacock entitled to commissions after he resigned?

The parties agree that Peacock was an at-will employee of Carpedia pursuant to a written contract which is made up of a written offer letter signed by plaintiff on October 31, 2006, as well as an attached "MAP" document. Dkt. 135-3 at 34-42. The letter agreement set plaintiff's yearly salary at $172,500 plus 7% commissions on new accounts after a minimum "equivalent revenue" is achieved on the accounts. *Id*. at 34. Plaintiff was also to receive 7% commissions on "referral accounts" and 2% commissions on "base accounts." *Id*. The letter directs plaintiff to "the attached MAP which clarifies the details of commission." *Id*. The MAP provides that commissions will be paid on the 21st of each month based upon a calculation of "a 12 month rolling average of *fee*

*receipts.*" *Id*. at 42. These payments would be made in addition to any salary paid to the sales executive (and, in some instances, as noted above, only after a minimum amount of receipts on the sales executive's accounts had been received). *Id*.

It is also uncontested that commissions were computed during plaintiff's employment with Carpedia during 2007, 2008, 2009, and 2010, on the basis of three successive versions of a "Decision Matrix for Commission Allocation" which were used to perform the requisite commission calculation. Dkt. 135-3 at 44-52. Each iteration of the matrix, including the final matrix applicable as of January 1, 2010, contains the statement that "If you leave the employment of Carpedia, you are not eligible for bonus or commission past the date of departure." *Id*. at 44, 46, 49, 52. Peacock asserts, however, that the decision matrix did not become part of the contract, and that any statement in the matrices limiting his right to commissions is not part of the agreement because the matrix is not a document that was signed by all parties. Indeed, if the matrices are part of the employment agreement, then plaintiff's claim to additional commission payments necessarily fails.

The parties also agree that plaintiff complained about the lack of sales leads and a resultant lack of commissions in June 2008, or some sixteen months after he started working for Carpedia. Dkt. 135-4 at 39-40. Plaintiff suggested that his salary be increased to $270,000 annually. *Id*. In response, Carpedia increased plaintiff's salary to $275,000 annually, and agreed to take steps designed to increase plaintiff's sales. Dkt. 135-2 ¶ 6.

On March 24, 2010, plaintiff sent an email to Mark Follows referencing "recent conversations" and suggesting three separate scenarios for plaintiff's "last day at Carpedia." Dkt. 135-3 at 8. Plaintiff suggested he could "stay through the end of this summer [2010] when my commissions would be fully paid." *Id*. In the alternative, he suggested staying on to assist in

7

attempting to close "the promising prospect I mentioned to you on the phone," or finally, that he could "stay a couple more weeks and hand my outstanding prospects to whoever you choose." *Id*. In either of the last two scenarios, plaintiff noted that the parties "could have a separate agreement on [plaintiff's] outstanding commissions." *Id*.

The above facts establish that the matrices were an acknowledged part of the employment contract for 3 ½ years—commissions were paid only with reference to the matrices. Plaintiff's argument that the matrices were not signed by the parties cannot undo the parties' clear course of conduct which is conclusive evidence that the matrices were an integral part of the employment agreement. In this respect, in determining a meeting of the minds concerning the use of the matrices, courts use an objective standard, considering what the parties did and said, not their subjective states of mind. *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex.App.-Amarillo 2008). The parties' exclusive reference to the matrices is clear evidence, and even now plaintiff is computing his alleged damages with reference to at least the methodology set forth in the 2010 version of the matrix. Most tellingly, Peacock himself implicitly acknowledged in his March 24, 2010 email that he understood that his commissions for work already signed with clients *would not be paid under the existing agreement until the end of the summer*. Indeed, this is consistent with the MAP, which Peacock concedes is part of the written agreement, and which states that commissions are earned only when money is actually received from clients. The MAP refers to the matrix, albeit obliquely, when it states that severance payments to persons terminated for poor performance would receive a severance payment "and any commissions earned pursuant to applicable company policy." Dkt. 135-3 at 36. The "policy" referred to is the matrix which plaintiff was provided, and in accordance with which his commissions were computed and paid during his entire course of employment at Carpedia.

The "rolling average" is also a reference to the matrix, which is the sole means of obtaining the number which is referenced in the MAP. In short, the actions of the parties over 3 ½ years proves their joint understanding, and meeting of the minds, that commissions were allocated based upon the methodology and rules set forth in the then-current version of the matrix. Pursuant to the MAP and the matrix, commissions are paid when payments are received from clients, and commissions are not paid when an employee leaves Carpedia.

Plaintiff cites to a handful of cases arguing that an employee's right to a commission can survive an employment relationship. The court agrees with this general proposition, as does Carpedia. The question, however, is whether the parties agreed *in this case* that plaintiff would be entitled to commission payments post-resignation, and the contract clearly states otherwise. Each of the cases cited by plaintiff is readily distinguished. In *Burkard v. ASCO Co.*, 779 S.W.2d 805, 806 (Tex. 1989), the court found that a bonus would be paid for the portion of the year the employee was employed because "the contract did not condition [the right to a bonus] on Burkard's continued employment for an entire year, nor was Burkard ever told that by failing to complete the term of the contract she would forfeit her right to a bonus." Here, the contract spelled out clearly that commissions would not be paid until the receipt of payments from the client, and that such commissions would cease when the employee left Carpedia.

Plaintiff also cites to *Trask v. Metrocall*, 252 F.3d 1355 (5th Cir. 2001) (per curiam) for the proposition that commission payments can be paid post-termination, but the opinion does not analyze the relevant contractual provisions. The only issue on appeal was the timeliness of the appeal. This case does not advance plaintiff's argument. Likewise, *Paniagua v. City of Galveston, Tex.*, 995 F.2d 1310, 1313 (5th Cir. 1993) dealt with the issue of standby payments under a written

9

contract for hours already worked. Thus, the court did not make any ruling relevant to the issue of whether commissions had been earned.

Lastly, plaintiff cites to *Jourdan v. Schenker Intern., Inc.*, 71 Fed.Appx. 308 (5th Cir. 2003). In that case, the court was required to interpret when a bonus was earned, and the court found that the contract did not specify. "[T]he language of the payment clause of the incentive plan is at the least ambiguous and sheds no light on the question of when an employee's right to a commission accrues. The proper construction of an ambiguous contract is a question of fact." *Id*. at 312. Here, by contrast, the MAP and the matrix are both clear—commissions are paid only upon actual receipts from clients. Thus, *Jourdan* does not support plaintiff's argument.

These, then, are the relevant and unambiguous terms of the employment agreement with respect to amounts due to plaintiff upon his deciding to leave Carpedia: (1) plaintiff's employment was at-will, and could be terminated by either party at any time; (2) his initial salary was $172,500 plus any commissions; (3) his salary was renegotiated upward to $275,000 in June, 2008 at plaintiff's instance; (4) commissions were due and payable only when payments are received from customers; (5) commissions were payable pursuant to company policy which is spelled out in detail in a "Decision Matrix for Commission Allocation" issued by the company; (6) the January 1, 2010 version of the matrix provides that persons who leave the company "are not eligible for bonus or commission past the date of departure." Carpedia's refusal to pay plaintiff for any commissions past his final date of employment of April 9, 2010, is not a breach of the employment agreement.[2]

---

[2] Plaintiff also asserts that he may be entitled to commissions pursuant to the "procuring cause rule." But, that rule is inapplicable because it only applies to commissions earned where there is no express contractual provision providing when commissions will be paid. *LaScola v. U.S. Sprint Communications*, 946 F.2d 559, 561 (7th Cir. 1991).

b.	**Number of sales leads or first meetings.**

Plaintiff also asserts that the agreement guaranteed a certain number of sales leads or first meetings, but this assertion is simply not supported by a reading of the agreement's express terms. The basis for Peacock's allegation that he was promised a certain amount of sales leads, or meetings, appears in the agreement where it states that "First meetings will be conducted at a rate of 8 per week." Dkt. 135-3 at 35. This statement appears under the heading "Performance Expectations"—clearly a reference to the expectations for performance *by the sales executives*, and is not a commitment from the company. Dkt. 135-3 at 35. The MAP also states under the heading "Sales roles, responsibilities and compensation" and the sub-heading "Roles and responsibilities" that first meetings will be conducted at a rate of 8 per week. *Id*. at 38. Again, however, the MAP does not identify this as a *commitment from* Carpedia. The context of the statement indicates that it is part of the expectations of performance *by the sales executive*. For example, the same section indicates that, with respect to first meetings, "all efforts will be made to work with the Kitchen to maximize meeting production." *Id*. The "Kitchen" is a resource Carpedia required sales executives to use. Likewise, the sales executive is instructed that feedback on any meetings "will be timely and complete." *Id*.

The target for sales meetings is, therefore, included in a list of things that Carpedia expects from the sales executives, and the context of the statement within the agreement as a whole establishes that the goal of 8 meeting per week was not a commitment by Carpedia to provide any specific number of sales leads to Peacock. Therefore, Carpedia's motion for summary judgment is GRANTED, and Peacock's motion for summary judgment is DENIED, with respect to Peacock's breach of contract claim based upon Carpedia having given him insufficient sales leads.

**2.     Fraudulent Inducement.**

Peacock alleges that he was induced to enter into the at-will employment contract with Carpedia by promises that he would be provided with sales leads sufficient to permit him to receive more compensation than he earned in his last year at his prior employment. Dkt. 48 ¶ 17. Texas law requires proof of six elements to establish a claim of fraud:  (1) a material misrepresentation; (2) the representation is false; (3) the speaker knew it was false or was reckless in making the statement; (4) the speaker intended that the other party act upon the statement; (5) reasonable reliance; and (6) injury resulting from the misrepresentation. *Fagan Holdings, Inc. v. Thinkware, Inc.*, 750 F.Supp. 2d 820, 833 (S.D. Tex. 2010).

Carpedia argues, *inter alia*, that even assuming that statements made to Peacock led him to believe that he would make substantially more money than he ultimately did with Carpedia, that the statements amounted to future predictions regarding the profitability of Carpedia's business and, accordingly, are not actionable. The court agrees. There is nothing in this case that takes it out of the general rule that "future predictions and opinions, especially regarding the future profitability of a business, cannot form a basis for fraud as a matter of law." *Zar v. Omni Industries, Inc.*, 813 F.2d 689, 693 (5th Cir. 1987).

Further, the contract in this case provided that Carpedia would "do everything we can to support your success in the region *but ultimately you bear the responsibility to get results*" and also specifically informed plaintiff that his income would be "highly variable." Dkt. 135-3 at 36, 41. Peacock knew when he signed the contract that it was at-will and may not last long enough for him to earn substantial commissions. He also knew that any commissions he would earn would be "highly variable" and speculative. In light of this express language in the contract, plaintiff cannot

have reasonably relied on any pre-contract statements concerning a guarantee of any particular amount of commissions. Carpedia's motion for summary judgment is GRANTED with respect to plaintiff's claim of fraudulent inducement, and plaintiff's motion for summary judgment is DENIED with respect to that claim.

3.  **Tortious Interference with Contractual Relationship.**

In order to establish a claim of tortious interference with contract, a plaintiff mush show (1) a contract subject to interference exists; (2) the alleged act of interference was willful and intentional; (3) the willful and intentional act proximately caused damage; and (4) actual damage or loss occurred. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Carpedia is not capable of tortiously interfering with its own contractual obligations because, generally, " 'a [defendant] must be a stranger to a contract to tortiously interfere with it.' " *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 761 (Tex. 2006) quoting *Morgan Stanley & Co., Inc. v. Tex. Oil Co.*, 958 S.W.2d 178, 179 (Tex.1997). Carpedia's motion for summary judgment is GRANTED on this claim and plaintiff's motion for summary judgment is DENIED on this claim.

4.  **Carpedia's counterclaims.**

    a.  **Fraudulent inducement.**

Carpedia asserts that Peacock affirmatively misrepresented that he was still employed when he negotiated with Carpedia, and also misrepresented his experience and qualifications, thereby fraudulently inducing Carpedia to hire Peacock. Carpedia's claim suffers from the same lack of reasonable reliance as does plaintiff's. The agreement was at-will, meaning that Peacock could have left at any time. Thus, Carpedia had no guarantee that Peacock would stay for any specific period of time, or that it would receive any particular return on its investment in Peacock. Therefore,

Carpedia cannot reasonably have relied on representations made by Peacock concerning how well he would perform.

Further, the record in this case reveals that Peacock's performance was satisfactory from Carpedia's viewpoint. The record reveals that Peacock had some success selling Carpedia's services, and that Carpedia gave Peacock a substantial raise in June 2008 when he complained about a lack of commission income. Certainly any misrepresentations about Peacock's abilities or employment status had nothing to do with Carpedia's willingness to, in essence, renegotiate his contract in June 2008. Peacock's motion for summary judgment is GRANTED with respect to Carpedia's counterclaim for fraudulent inducement.

### b. Counterclaims relating to the severance/release.

Carpedia alleges counterclaims for fraud and/or negligent misrepresentation, declaratory judgment, breach of contract seeking specific performance, and money had and received, all arising from what is, in essence, a failed negotiation between Carpedia and Peacock over severance pay. As noted above, Peacock indicated his desire to leave Carpedia and suggested that he could stay on through "the end of this summer when [his] commissions would be fully paid," or alternatively that he could leave earlier which would require "a separate agreement" for "outstanding commissions." Dkt. 135-3 at 54. Mark Follows responded that Carpedia was not obligated to pay any commissions under its contract of employment with Peacock, but that an agreement might be reached in return for a release signed by Peacock. *Id*. at 55. Then, prior to reaching any agreement with Peacock, Mark Follows made a "minimum offering" by instructing Carpedia staff to pay Peacock his April salary. *Id*. at 2. Follows did *not* make this payment conditional in any way, and certainly did not condition it upon Peacock's acceptance of a final offer or in return for a release. Rather, prior to the salary

payment being made, Mark Follows made an offer of settlement which included both the salary payment for April 2010, and an additional payment which would be made only if Peacock signed a release before May 14, 2010. *Id*. at 17. Mark Follows indicated that the release would only be valid if signed by May 14, 2010, at which time the "final payment" would be then be processed. *Id*. The salary payment was sent to Peacock's checking account on April 30, 2010, but Peacock never signed the release.

Carpedia first asserts that a contract was formed when Peacock accepted the salary payment but then refused to sign the release. The court has no trouble concluding that there was no meeting of the minds in this respect. Indeed, the April salary payment does not even appear to be an offer for an agreement, because Peacock was not required to do anything if he accepted it. And, in any event, Peacock was certainly entitled to at least a portion of his April salary. It was Carpedia's representative who decided to pay Peacock for the entire month of April " as a gesture of good will." That gesture of good will did not require Peacock to agree to do anything and, in fact, Peacock did not agree to the release. Instead, Carpedia put a time frame only on the release itself, and conditioned only the "additional payment" on Peacock signing the release. In this situation, it is clear that, by the terms *set by Carpedia*, no severance contract was agreed to by the parties. Further, the payment made to Peacock was a "minimum offering" from Carpedia's viewpoint, but was paid in such a way that Peacock cannot be expected to believe that he would have to return it if no ultimate agreement on the "final payment" was reached and the release was not executed.

Carpedia may have intended to condition Peacock's retention of the initial payment on the parties reaching an agreement including a release, but it simply failed to do so. The court can find no basis for declaring that a contract was formed because Carpedia cannot prove that there was a

meeting of the minds. *Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.AW.3d 631, 636 (Tex. App.—Houston[1st Div.], rev. denied).

Further, and because Carpedia did not make acceptance of the "minimum payment" to Peacock conditional in any respect, the court can find no basis for declaring that Carpedia can recoup an admittedly voluntary payment made "as a gesture of good will." Carpedia extended the payment without condition in the hope that a settlement could be reached. This is, as Peacock argues, a voluntary payment made in the face of Peacock's claim of right to both his salary and commissions. In this respect, Peacock could reasonably assume that once the April salary payment was made, the "matter was closed" between the parties with respect to the sum paid to Peacock. *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009) (party voluntarily paying out money in face of claim of right cannot change his mind and invoke aid of court). In this respect, it is irrelevant that Carpedia was ultimately correct that it did not contractually owe a duty to pay all of the money that Peacock requested—Carpedia knew it owed Peacock something for his work in April, and voluntarily made a good faith gesture which it cannot now take back simply because, in hindsight, it may have been a mistake. Peacock's motion for summary judgment is GRANTED with respect to Carpedia's claims seeking to recoup the April 2010 payment made to Peacock on breach of contract theories.

Carpedia also asserts that it was either negligently or fraudulently induced into making the payment to Peacock. Before negotiating with Carpedia over final commission payments, Peacock had already accepted a position with the Highland Group. Dkt. 135-10 at 6. Peacock told Carpedia, however, that he had not accepted new employment. Carpedia believes that this false statement, which it terms "negotiation tactics," amounts to fraud because, Carpedia now asserts, it would not have made any payment to Peacock if he had accepted a new job elsewhere. Carpedia ignores,

16

however, that Peacock never requested the advance of funds. Peacock was waiting upon an offer for a severance agreement. Carpedia decided, unilaterally, to pay him a full salary for April 2010 in order to better position itself to negotiate an agreement that would lead to a release. In this respect, Carpedia did not rely on anything plaintiff said—it acted for its own purposes and to secure a release. Thus, there is no proof of either actual or justifiable reliance for either the fraud claim, or the negligence claim, and both require proof of "actual and justifiable reliance." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Peacock's motion for summary judgment is GRANTED with respect to the claims for negligent and/or fraudulent inducement concerning the April 2010 payment made to Peacock, and Carpedia's motion for summary judgment is DENIED as to those claims.

## Conclusion

After a review of the motions before the court, the responses, and the applicable law, Carpedia's motion for summary judgment is GRANTED with respect to all of plaintiff's claims, and plaintiff's motion is DENIED with respect to plaintiff's claims. Plaintiff's motion for summary judgment with respect to Carpedia's counterclaims is GRANTED, and Carpedia's motion for summary judgment with respect to certain of its counterclaims is DENIED. Carpedia's motions to strike (Dkts. 156, 175, and 184) are DENIED AS MOOT in that the court has disregarded any legal conclusions or otherwise improper affidavit evidence offered by plaintiff. It is so ORDERED.

Signed at Houston, Texas on May 31, 2012.

_____
Gray H. Miller
United States District Judge